## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

MELINDA CHALLENDER, JESSICA GREENE,
BRITTANY KRITZ, DARNELL MUDGETT,
MIKAELA SCHAEFER, and ASHLEY TRYLCH,
On their own behalf and on behalf of
all others similarly situated,                                    Case No.

               Plaintiffs,                                      Hon.

v.

NORTHWEST MICHIGAN SURGERY CENTER,
L.L.C. d/b/a COPPER RIDGE SURGERY CENTER,

               Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com
Kara@hurwitzlaw.com

---

There is no other pending or resolved civil action arising out
of this transaction or occurrence alleged in the Complaint.

## **COMPLAINT AND JURY DEMAND**

      Plaintiffs Melinda Challender, Jessica Greene, Brittany Kritz, Darnell Mudgett, Mikaela

Schaefer, and Ashley Trylch (collectively, "Plaintiffs"), on behalf of themselves and all other

similarly situated individuals, by and through their attorneys, Hurwitz Law PLLC, state the

following for their Complaint and Jury Demand against Defendant Northwest Michigan Surgery

Center, L.L.C. d/b/a Copper Ridge Surgery Center (hereinafter, "Defendant"):

*Religious freedom has been "zealously protected, sometimes even at the expense of other interests of admittedly high social importance."*

*Wisconsin v. Yoder, 406 U.S. 205, 214 (1972).*

## INTRODUCTION

1.    There is no pandemic exception to the protections afforded by Title VII of the Civil Rights Act of 1964 ("Title VII") and the Elliott-Larsen Civil Rights Act ("ELCRA").  Defendant clearly did not understand this when it terminated Plaintiffs in retaliation for requesting a religious accommodation to the COVID-19 vaccine.  Instead of engaging with Plaintiffs in the spirit of "bilateral cooperation," Defendant denied their religious accommodation requests without justification.

2.    This action is also brought pursuant to the opt-in collective action provisions of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. § 216(b) (sometimes referred to as an "opt-in" class action).  Plaintiffs bring this action on their own behalf and on behalf of all other employees of Defendant, present and former, who were and/or are affected by the actions, pay schemes, policies and procedures of Defendant.  In addition, Plaintiffs bring this action in their individual capacity, separate and apart from the collective action claims set forth herein.

## PARTIES AND JURISDICTION

3.    Plaintiff Melinda Challender ("Plaintiff Challender") was a Medical Records Clerk for Defendant.  Plaintiff Challender submitted a religious accommodation request on November 23, 2021, to which Defendant responded by terminating her on February 3, 2022.  Plaintiff Challender is an individual residing in Traverse City, Michigan, which is located in Grand Traverse County.

4.    Plaintiff Jessica Greene ("Plaintiff Greene") was a Medical Records Clerk for Defendant.  Plaintiff Greene submitted a religious accommodation request on November 23, 2021,

to which Defendant responded by terminating him her February 3, 2022.  Plaintiff Greene is an individual residing in Traverse City, Michigan, which is located in Grand Traverse County.

5.      Plaintiff Brittany Kritz ("Plaintiff Kritz") was a Clinical Registered Nurse for Defendant.  Plaintiff Kritz submitted a religious accommodation request on November 29, 2021, to which Defendant responded by terminating her on February 3, 2022.  Plaintiff Kritz is an individual residing in Traverse City, Michigan, which is located in Grand Traverse County.

6.      Plaintiff Darnell Mudgett ("Plaintiff Mudgett") was an Operating Room Aid for Defendant.  Plaintiff Mudgett submitted a religious accommodation request on November 29, 2021, to which Defendant responded by terminating him on February 3, 2022.  Plaintiff Mudgett is an individual residing in Traverse City, Michigan, which is located in Grand Traverse County.

7.      Plaintiff Mikaela Schaefer ("Plaintiff Schaefer") was a Radiology Technician for Defendant.  Plaintiff Schaefer submitted a religious accommodation request on November 18, 2021, to which Defendant responded by terminating her on February 3, 2022.  Plaintiff Schafer is an individual residing in Williamsburg, Michigan, which is located in Grand Traverse County.

8.      Plaintiff Ashley Trylch ("Plaintiff Trylch") was an Operating Room Registered Nurse for Defendant.  Plaintiff Trylch submitted a religious accommodation request on November 29, 2021, to which Defendant responded by terminating her on February 3, 2022.  Plaintiff Trylch is an individual residing in Traverse City, Michigan, which is located in Grand Traverse County.

9.      Defendant is a Michigan domestic limited liability company with its principal place of business in Traverse City, Michigan.  Defendant's registered agent is located in Plymouth, Michigan.

10.      Plaintiffs' claims arise out of Defendant's violation of ELCRA and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

11.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331.

12.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391, as it is the district where the events giving rise to Plaintiff's claims took place and where Defendant regularly conducts business.

13.     Plaintiffs submitted Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 29, 2022 and will amend this Complaint to add claims under Title VII upon receipt of an EEOC Right to Sue letter.

## FACTUAL ALLEGATIONS

### COVID-19 and Defendant's Response to
### the Center of Medicare and Medicaid Services Interim Final Rule

14.     By Spring 2020, the SARS-CoV2 ("COVID-19") virus had spread to many nations, including the United States.

15.     In that timeframe, Defendant began implementing certain mitigation procedures for its workforce, such as wearing masks or other Personal Protective Equipment ("PPE"), maintaining minimum distances from other workers, and receiving body temperature checks.   In addition, Defendant increased the cleaning and sanitation of its facilities.

16.     Defendant's services never ceased during the COVID-19 pandemic.

17.     Defendant's employees were required to enter Defendant's facility regardless of vaccination status while donning PPE.

18.     On or about November 5, 2021, the Centers for Medicare & Medicaid Services ("CMS") issued an emergency regulation entitled "CMS Omnibus COVID-19 Health Care Staff Vaccination Interim Final Rule," which requires that certain employers who are certified under the Medicare and Medicaid programs to issue a policy requiring all employees to be vaccinated against COVID-19 (the "CMS Mandate")

4

19.     Thereafter, on November 12, 2021, Defendant's Chief Executive Officer, Tina Piotrowski ("Ms. Piotrowski"), sent an email to all staff with the subject heading, "COVID-19 Exemption Form and vaccination card update."  The email announced Defendant's compliance with the CMS Mandate.

20.     Ms. Piotrowski outlined the CMS Mandate's timeline for employees to receive the COVID-19 vaccine.  All staff were required to receive the first dose of a two-dose COVID-19 vaccine or a one-dose COVID-19 vaccine prior to December 5, 2021 and be fully vaccinated by January 4, 2022.

21.     Ms. Piotrowski's email claimed, "We are working on an official CRSC policy," which foreshadowed Defendant's own internal policy mandating COVID-19 vaccination.

22.     Ms. Piotrowski also acknowledged that the CMS Mandate carves out exemptions to the mandate based on sincerely held *bona fide* religious beliefs, observances, or practices and for medical conditions.

23.     Accordingly, Defendant elicited accommodation requests, and the last day to submit applications for religious or medical exemptions was November 30, 2021—just 18 days after Defendant announced it would implement a COVID-19 vaccine mandate.

**Plaintiffs' Employment and Religious Accommodation Requests**

24.     Defendant's exemption form asked four questions:

(1)     Please identify your sincerely held religious belief, practice or observance and describe how that prohibits you from receiving the COVID-19 vaccination;

(2)     Please indicate the religious nature on which you object to the COVID-19 vaccine;

(3)     Please identify the particular accommodation or modification to your position requirements you are requesting; and

(4)    How long you will require this exemption?

25.    All Plaintiffs submitted their religious accommodation requests detailing their sincerely held *bona fide* religious beliefs precluding vaccination.

26.    The sincerity of Plaintiffs' religious beliefs is not open to question.  *See Equal emp. Opportunity Comm'n v. Publix Super Markets, Inc*., 471 F. Supp. 3d 684, 699 (M.D. Tenn. 2020); *citing United States v. Seeger*, 380 U.S. 163, 185 (1965) ("[T]he truth of a belief is not open to question).

27.    Title VII's definition of "religion" includes "all aspects of religious observance and practice, as well as belief."  42 U.S.C. § 2000e(j); *see also* 29 C.F.R. § 1605.1 ("In most cases whether or not a practice or belief is religious is not at issue… [R]eligious practices… include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views.").

28.    An individual's testimony about his or her belief "must be given great weight" and is enough to show she has a *bona fide* religious belief.  *See e.g.*, *Seeger*, 380 U.S. at 184 (1965) (When dealing "with the beliefs of different individuals who will articulate them in a multitude of ways… the claim of the [party] that his [or her] belief is an essential part of a religious faith must be given great weight).

29.    Moreover, "[a]s long as a party's beliefs are religiously asserted, it is not for the courts to challenge the truthfulness of such assertions simply because they developed 'from revelation, study, upbringing, gradual evolution, or some source that appears entirely incomprehensible."  *E.E.O.C. v. Alliant Techsystems, Inc*., No. CIV.A. 98-0084-R, 1998 WL 777015, at *6 (W.D. Va. Sept. 18, 1998) (*quoting Hobbie v. Unemployment Comm'n of Fla*., 480 U.S. 136, 144 n. 9 (1987)).

30.     There is no factual predicate in the record to suggest that Plaintiffs lacked sincerity in their religious beliefs.

31.     Plaintiffs' requests for accommodation included scripture and anecdotal illustrations of their sincerely held religious beliefs precluding vaccination.

32.     For example, Plaintiff Schaefer submitted her religious accommodation request November 14, 2021.  Plaintiff Schaefer wrote, in pertinent part:

> This vaccine is in conflict with my deeply held religious beliefs.  My God has dictated that I am fearfully and wonderfully made, and receiving the COVID-19 vaccination would go against that belief.  Psalm 139: 13-14.  "For you created my inmost being; you knit me together in my mother's womb.  I praise you because I am fearfully and wonderfully made; your works are wonderful, I know that full well."  Christ is my strength and my savior.  I talk with Him and pray to Him throughout my days, as He walks besides me, guiding me in all I do.  I trust in my God and His plan for me.  I believe if I were to get Covid-19, I could fight it off because of His strength in me and the good health He has provided me…
>
> *     *     *
>
> I have been a member of Sacred Heart Roman Catholic Church in Elk Rapids, MI since I was a child.  I attend most every weekend with my husband and 10 month old daughter, with both of our parents beside us.  I was baptized and received first communion as a Catholic.  My husband and I were married at Sacred Heart and our daughter was baptized May 2, 2021 and became a child of God and a member of Sacred Heart as well…
>
> 1 Corinthians 6:19-20.  "Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God?  You are not your own; you were bought at a price.  Therefore honor God with your bodies."  As a practice catholic I do not agree with abortion and know that the COVID-19 vaccine uses fetal cell in lines in research, testing and production.  Fetal cell lines were used to develop and test the Pfizer and Moderna vaccines.  Additionally fetal cell lines are being used in the production of the Johnson & Johnson vaccination also.  I would feel immoral about putting a vaccine inside my body that has any association with the abortion of babies.  My body is the Temple of the Holy Spirit and must be honored as such, so I am very conscious of what I put into my body.

33.     Plaintiff Schaefer's accommodation request also provided ample notice of her pregnancy-related condition (*i.e.*, as a breastfeeding mother) and her desire for reasonable accommodation.  She stated:

> Psalm 127:3. Children are a gift from the Lord; they are a reward from him.  As a breastfeeding mother, I am very worried about receiving the COVID-19 vaccine . . . [T]his vaccine is not even authorized for children under the age of five . . .

34.     Employees are entitled to reasonable accommodations for pregnancy-related conditions, such as breastfeeding.

35.     "A pregnant employee may be entitled to reasonable accommodation under the ADA for limitations resulting from pregnancy-related conditions…"  *Enforcement Guidance on Pregnancy Discrimination and Related Issues*, EQUAL EMP. OPPORTUNITY COMM'N (2015),   https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues#IIB.

36.     Further, on November 22, 2021, Plaintiff Challender submitted a three-page letter entitled, "Notice of my Deeply Held Religious Beliefs and Convictions."  Plaintiff Challender wrote, in pertinent part:

> My deeply held religious beliefs and convictions come from my love for HaShem (the Creator of the Universe) and for His commandments, decrees, ordinances, and statutes as taught in the Jewish Torah and Tanakh . . . I believe our bodies have been designed by our Creator to operate in a certain way and vaccines are diametrically opposed to that way… Genesis 1:26 states: "Let us make Man in Our image, after Our likeness."  Verse 27 states: "So Elohim created Man in His image, in the image of Elohim He created him; male and female He created them."  And verse 31 states "And Elohim saw all that He had made, and behold it was very good."  This means that man was created with everything he needed to survive this world healthy and happy.  Vaccines, by their very design and nature, corrupt our bodies' natural defenses against

diseases, viruses, bacteria, etc. and therefore is a corruption of the body itself…

\*       \*       \*

Psalm 139: 13-16 states that the Creator created our minds and fashioned us win our mother's womb, that we are "awesomely and wondrously made" and that "His work is "wonderful." The Scriptures also states, "though shall not murder," the 6th commandment of the Ten Commandments (Exodus 20:13; Deut. 5:17).  To take a human being's life at the most vulnerable and helpless stage of their lives in their mother's womb is not only out and out murder, but then harvest the victim's body for parts for use in vaccines and other products takes it to a whole new level… To allow such a  product made from this heinous act to be injected into my body would be an outrage!

\*       \*       \*

To love HaShem with all my mind, soul, and strength, and to keep His Commandments is the very essence of my deeply held religious beliefs and convictions.  The knowing or willing violation of any of his Commandments is rebellion and sin, and carries consequences. (Exodus 20:1-14, Deuteronomy 5; 6:4-5; 10:12; 11:1, Leviticus 20, etc.).

37.     Plaintiff Greene submitted her religious accommodation request on November 23,

2021.  Plaintiff Greene wrote, in pertinent part:

My sincerely held religious beliefs are based on a Christian Worldview.  I pray on a daily basis that I wouldn't have to make this decision, and that my sincerely held religious beliefs are not discriminated against.  No two people walk the same path with God even though we may be part of the same religious/denomination does not mean that our religious convictions are 100% the same.  I hold myself to my own personal morals, ethics and religious views. God teaches us that our bodies are a temple of the Holy Spirit, and we are to treat them as such.  The COVID shots are an unclean mechanism for altering my God given temple (body).  All three of the currently available COVID shots are derived from or developed with, or tested with fetal cell lines.  I will not be subjected to a treatment that directly violates my sincerely held belief in the sanctity of life or alter my temple (body) in ways that go against my religious beliefs.  I will not betray my God, my relationship with Him, or my sacred values.

38.     Plaintiff Kritz submitted her religious accommodation request on November 27,

2021.  Plaintiff Kritz wrote, in pertinent part:

> I feel that there is a sincere disregard for my beliefs when it comes to the COVID-19 vaccination mandate.  It is my obligation to protect my body, the temple that God made to be, from being injected with experimental ingredients such as fetal tissue, or any type of cell lines, and other foreign substances that were not originally intended for use in my body.  I firmly believe my body was made perfectly as it is.  "Know ye not that ye are the temple of God, and that the spirit of God dwelleth in you?  If any man defile the temple of God, him shall God destroy; for the temple of God is holy, which temple ye are."  Corinthians 3:16-17.  In addition, I would prefer to live my life making my own decisions not based on coercion, manipulation, or intimidation by others, "… I send you forth as sheep in the midst of wolves: be ye therefore wise of serpents, and harmless as doves."  Matthew 10:16.
>
> Furthermore, as part of this religious exemption, I request being able to do my job and not be treated differently for my beliefs, just as I do not treat anybody else differently in the workplace for their beliefs.  This is not only part of my constitutional rights, but also the Golden Rule, which I embody wholeheartedly.  And, I hope that by continuing to wear masks during work hours just like everybody else, that this alone will suffice.   In conclusion, this is an unfathomable requirement that would bring dishonor to my body/temple of God.

39.     Plaintiff Trylch submitted her religious accommodation request on November 28,

2021.  Plaintiff Trylch wrote, in pertinent part:

> I have prayed about how to respond to this directive, and in light receiving a COVID-19 vaccine would violate my sincerely held religious beliefs. As a baptized Christian I believe life begins at conception and ends at natural death. I believe that my body belongs to God and is the temple of the Holy Spirit. "Do you not know that your bodies are temples of the holy spirit, who is in you, whom you have received from God? You are not your own, you were bought at a price. Therefore honor God with your bodies."(1 Cor 6: 19-20).
>
> As a Christian I fear God, and follow His word. "Do you not know that you are God's temple and that God's spirit dwells in you? If anyone destroys God's temple, God will destroy him. For God's temple is holy, and you are that temple." (1 Cor 3:16-17) The

10

COVID-19 vaccines are in direct conflict with my deeply held religious beliefs against using fetal cell lines in my body. Fetal cell lines are derived from aborted fetuses. I do not believe in abortion. Abortion is murder. God says, "You shall not murder." (Exodus 20:13) I respectfully refuse to inject these fetal cell line vaccines into my body. My spiritual and religious foundation has instilled pro-life and anti-abortion values in my beliefs. COVID-19 vaccines use fetal cell lines in research, testing, and production. Fetal cell lines were used to develop and test both the Moderna and Pfizer vaccines. Fetal cell lines are being used in the production of the Janssen vaccine. My Lord is the only vaccine I need for protection from COVID-19. God has graciously blessed me with a healthy immune system which will help me fight off any sickness I may encounter and in turn give me a natural immunity. Going against His Holy guidance would be a sin.

Religious exemption is not only a right but consequential to a believer who has fully put their trust in the Lord Jesus Christ to heal them. Listening to the Holy Spirit in times of guidance is key to giving life to the word of God. This notion gives the true inner strength and heart of the believer to remain steadfast and unmovable.

40.    All Plaintiffs sought to make daily decisions, including those regarding vaccination and other medical decisions, through faith-based reasoning.

41.    Plaintiffs sincerely held religious beliefs precluded them from taking the COVID-19 vaccine.

42.    Plaintiffs' accommodation requests also proposed several reasonable accommodations, including mask wearing, social distancing, daily and/or weekly testing, and working remotely in lieu of vaccination.

43.    Consistent use of a face mask or respirator is associated with lower odds of infection. See Kristin L. Andrejko et al., *Effectiveness of Face Mask or Respirator Use in Indoor Public Settings*, CTRS. FOR DISEASE CONTROL AND PREVENTION (2022), available at https://www.cdc.gov/mmwr/volumes/71/wr/mm7106e1.htm.

44.     None of the proposed accommodations were ever discussed with Plaintiffs, let alone seriously considered.

45.     On November 30, 2021—the deadline for Defendant's employees to submit accommodation requests—a nationwide preliminary injunction was entered against the CMS Mandate, which temporarily ceased all implementation or enforcement of it.  *See Louisiana v. Becerra*, No. 3:21-CV-03970, 2021 WL 5609846, at *17 (W.D. La. Nov. 30, 2021)

46.     Although all Plaintiffs submitted their religious accommodation requests in a timely manner before the November 30, 2021 deadline, Defendant delayed making its determinations until January 2022 as a result of the CMS Mandate being enjoined.

47.     All Plaintiffs remained unvaccinated and worked in Defendant's facility for the entire month of December 2021 with no ill effects on Defendant's operations or worsening in the health of Defendant's employees and patients.

**Defendant's Vaccine Mandate and Religious Discrimination**

48.     On December 2, 2021, Ms. Piotrowski sent an email to all staff with a subject heading entitled "UPDATED CRSC Covid Vaccine Policy."  The message announced that Defendant was creating its own COVID-19 policy (the "Policy"), which substantially mirrored the requirements under the CMS Mandate.

49.     Ms. Piotrowski declared, "I know this has been a difficult time for many of you and there have been some difficult decisions made.  We appreciate all that you are doing to stay in compliance with our policies . . . In light of the recent judicial stay of the CMS Covid Vaccine Mandate on 11/30/21, CRSC has revised our policy.  The main change to the policy is that we will extend the deadline one week until December 13[, 2022].  On December 13, [2022,] all staff reporting to work will need to comply with the policy."

50.     All employees were required to receive, at a minimum, the first dose of a primary series or a single dose COVID-19 vaccine, meaning the first dose of the Pfizer or Moderna vaccine or the only dose of the Johnson & Johnson vaccine by December 31, 2021 and a second dose by January 10, 2022.

51.     However, the Policy implied that denial of the accommodation request was a foregone conclusion: "Exemptions may be appropriate *in certain limited circumstances*, but no exemption will be provided to any employee . . . *who requests an exemption solely to evade vaccination*."  Of course, not desiring vaccination is the reason an employee files a religious and/or medical accommodation request.

52.     The Policy's "Scope" provides: "This policy pertains to all CRSC employees, licensed practitioners, students, trainees, and volunteers, and includes individuals who provide care, treatment, or other services for the facility and/or its patients under contract or other arrangements regardless of work site, whether working in-person or remotely, but excludes individuals who provide services 100% remotely and do not have any direct contact with patients or other staff."

53.     The Policy's "Purpose" states:  The purpose of this [P]olicy is to establish guidelines for COVID-19 vaccination for all CRSC employees to protect the health and safety of CRSC's patients and employees.

54.     Defendant's premise strains credulity because Defendant (a) welcomes unvaccinated patients and visitors onto premises; and (b) does not require patients who require treatment at Defendant's facility to be vaccinated, even though these individuals interact with Defendant's staff; and (c) does not require construction workers who visit Defendant's premises to be vaccinated, even though they interact with Defendant's staff as well.

55.     Defendant pressured employees to be vaccinated.

56.     Defendant ostracized unvaccinated employees by providing vaccinated employees with additional compensation in the form of gift cards and $500.00 bonuses for all full-time staff.

57.     An email from Ms. Piotrowski from December 3, 2021, provides: "I am happy to share some exciting news!  The physician owners and Board have approved a *special bonus* for all staff who have submitted a copy of their COVID-19 vaccine card on file or have received at least the first dose of a COVID-19 vaccine and provide a copy of their card . . . Full-time team members will receive a $500.00 bonus, part-time will receive $250.00 and PRN (who have worked hours in the past four pay periods) $100.00.  The bonus payment will be distributed . . . as an extra paycheck separate from your normal payroll…"

58.     Defendant's Policy was absolute; it offered no alternative, such as for periodic testing, mask wearing, social distancing, etc., even for employees who have already had COVID-19 and still possess natural immunity from the virus.

59.     Employees must choose vaccination or termination.  "Forcing individuals to choose between their faith and their livelihood imposes an obvious and substantial burden on religion . . . vaccine mandates . . . presents a crisis of conscience for many people of faith.  It forces them to choose between the two most profound obligations they will ever assume—holding true to their religious commitments and feeding and housing their children.  To many, this is the most horrifying of Hobson's choices."  *Sambrano v. United Airlines, Inc.*, 19 F.4th 839, 841 (5th Cir. 2021).

60.     Meanwhile, vaccinated employees in the workplace became hostile against Plaintiffs and other unvaccinated individuals.  Plaintiffs endured offensive remarks from colleagues regarding their vaccination status.

61.     Defendant's aggression towards unvaccinated individuals, including patients, fostered an unwelcoming environment and interfered with services.  On December 15, 2021, Pre/Post Operation Team Leader Brian Wisniewski sent a message to his unit entitled, "Respect." Mr. Wisniewski wrote:

> I've had a few people from different departments, as well as patients, approach me asking that we are mindful of the words we use when speaking about vaccines and vaccine status.  Everyone has a right to do what they feel best for themselves, and everyone has a right to have their opinions, but we can respect each other and our visitors enough to not speak negatively towards someone who isn't vaccinated, especially if we don't know their rationale for their choice.  Please be aware that your words can be hurtful and let's show respect to everyone.  Thanks everyone.

Nevertheless, offensive commentary towards Plaintiffs and unvaccinated individuals continued.

62.     On December 23, 2021, Plaintiff Kritz sent an email to Defendant's Human Resources Manager regarding a discriminatory comment she overheard at work.  Plaintiff Kritz wrote:

> I wanted to make you aware of something I overheard today that totally went against the email Brian sent out about respect for non-vaccinated employees . . . This is a coworker that knew my vaccination status when she said it . . . It felt like a punch in the gut. I have enough respect for all my coworkers not to mention or make statements like that about a particular belief or opinion.  It felt very inappropriate to me, and by responding in that way to an email that was sent out to validate the feelings of myself and other unvaccinated coworkers, it just heightened my feelings of being disrespected . . . It feels like discrimination to me, and as my exemption states, I want to be treated like everyone else in the workplace and not feel singled out or ostracized.

Human Resources never responded.

63.     On January 6, 2022, Defendant revised the Policy.  Again, Defendant's main revision was to extend the date for employees to receive, at a minimum, the first dose of a primary

series or a single dose COVID-19 vaccine.  This time, however, employees had until January 27, 2022.

64.     Defendant revised its Policy in anticipation of denying Plaintiffs' religious exemption requests the following day on January 7, 2022.

65.     On January 7, 2022, Defendant sent Plaintiffs identical letters denying their requests for religious accommodation to the Policy, wherein Defendant claimed that exempting employees from receiving the COVID-19 vaccine posed an undue hardship.

66.     The denial letter stated, in pertinent part:

This letter is to inform you that we reviewed your request for a religious exemption and determined that:

(a)     You stated a "sincerely held religious belief" that made you eligible for consideration of whether a reasonable accommodation could be offered.

(b)     Your request for accommodation(s) was not approved as requested based on CRSC's determination that it is unable to reasonably accommodate your religious beliefs without imposing an undue hardship on operations.

(c)     [Defendant] further determined that it is not able to offer alternative accommodations without undue hardship.

(d)     [Defendant] has an obligation to ensure that it minimizes the risk of transmission to at-risk individuals including its patients and staff, as required by CMS.  In determining a finding of undue hardship, CRSC reviewed the essential functions of your job description and took into account a number of other factors and considerations.

67.     The identical denial letters reflect that the Exemption Review Committee met on December 6, 2021 to make a determination on Plaintiffs' religious exemption requests, and reveal that the decision to deny Plaintiffs accommodation was not determined on an individual basis.

68.     Defendant never identified which of Defendant's personnel made up the "Exemption Review Committee" that denied Plaintiffs' accommodation requests.

69.     The denial letter asserted that employees who were denied exemption from Defendant's vaccine mandate had until January 27, 2022 to submit to the COVID-19 vaccine. Defendant dictated, "If you do not obtain your first vaccine by January 27, 2022, you should not report to work that day.  You will be placed on an unpaid leave of absence for up to five (5) days during which you must obtain your first vaccination.  If you do not obtain your first vaccine during that time period, your employment will be terminated."

70.     Defendant never provided an explanation why mask-wearing and other offered accommodations presented an undue hardship when the practice was deemed effective throughout the COVID-19 pandemic.  See *McDaniel v. Essex Intern., Inc*., 571 F.2d 338, 341 (6th Cir. 1978) ("The burden is on [the employer] to make an effort at accommodation and, if unsuccessful, to demonstrate that they were unable to reasonably accommodate the plaintiff's religious beliefs without undue hardship.").

71.     Plaintiffs were not told (a) what about their religious accommodation requests posed an undue hardship; or (b) why they individually could not be accommodated.

72.     Here, there was no offer of proof that mask-wearing and working remotely would result in actual disruption of the work routine.

73.     Defendant's refusal to deviate from a one-size-fits-all approach ignores the basic tenets of accommodation law.

74.     The statutory framework for determining reasonable accommodation requires an interactive process and participation by both the employer and the employee.  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (stating that, consistent with the goals expressed in the

legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business").

75. "Once an employee makes [an accommodation] request, the employer is obligated by law to engage in an interactive process—a meaningful dialogue." *Equal Emp. Opportunity Comm'n v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009). Defendant sabotaged the interactive process and evaded any sort of meaningful dialogue.

76. Defendant has no "satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962).

77. Plaintiffs could have followed existing COVID-19 protocols at Defendant's facility prior to the vaccine mandates.

78. Plaintiffs could have tested for COVID-19 daily and/or weekly.

79. Plaintiffs attempted to engage in an interactive process with Defendant in order to explore these options—they were denied any sort of bilateral compromise.

80. Upon information and belief, some of Plaintiffs' highly paid coworkers were granted religious exemptions to the Policy.

81. Plaintiffs suffered extreme emotional distress while waiting and watching for approval of their application for religious accommodation.

82. Defendant's religious animus is further demonstrated by the fact that Defendant provided medical exemptions to employees who submitted requests for medical accommodation.

83. Upon information and belief, individuals with approved vaccine accommodations are merely required to wear PPE as an accommodation.

84.     On January 7, 2022—the same day Plaintiffs received identical denial letters—Materials Clerk Stephanie Widmer's temporary medical exemption was approved.

85.     Defendant offered Ms. Widmer two accommodations: (1) wear a properly fitted N-95 mask at all times while in the facility; and (2) maintain a 6-foot distance between other employees.

86.     Defendant did not explain to Plaintiffs why some employees were accommodated while others were denied accommodation without bilateral cooperation.

87.     On September January 27, 2022, Defendant placed Plaintiffs on an unpaid suspension for the remainder of their employment.

88.     Plaintiffs were terminated effective February 3, 2022.

89.     Plaintiffs' religious conviction are highlighted by the fact they remained unvaccinated in the face of inevitable termination—losing their livelihood in the process.

**Defendant Violated EEOC Guidance**

90.     On March 1, 2022, the EEOC expanded its guidance on religious exemption to employer vaccine mandates under Title VII of the Civil Rights Act of 1964 ("Guidance").  This Guidance describes in greater detail the framework under which the EEOC advises employers to resolve religious accommodation requests.  *See* Guidance, *supra*.

91.     The EEOC emphasizes that as a reasonable accommodation, an unvaccinated employee entering into the workplace might wear a face mask, work at a social distance from coworkers or non-employees, work a modified shift, get periodic tests for COVID-19, be given the opportunity to telework, or finally, accept a reassignment.  *Id*. at K.2.

92.     The EEOC states that an employer cannot rely on speculative hardships when face with an employee's religious objection but, rather, should rely on objective information.  *Id*. at L.3.

93.     The EEOC states that, in many circumstances, it may be possible to accommodate those seeking reasonable accommodations for their religious beliefs, practices, or observances without imposing an undue hardship.  *Id*. at K.12.

94.     The EEOC instructs, "[i]f the employer denies the employee's proposed accommodation, the employer should explain to the employee why the preferred accommodation is not being granted."  *Id*. at L.5.

95.     "[T]he definition of religion is broad and protects, beliefs, practices, and observances with which the employer may be unfamiliar."  *Id*. at K.12.

96.     "The definition of 'religion' under Title VII protects both traditional and nontraditional religious beliefs, practices, or observances, including those that may be unfamiliar to employers."  *Id*. at L.2.

97.     "The employer should ordinarily assume that an employee's request for religious accommodation is based on sincerely held religious belief, practice, or observance."  *Id*. at K.12.

98.     "Employers should evaluate religious objections on an individual basis."  *Id*. at L.2.

99.     "An employer should thoroughly consider all possible reasonable accommodations."  *Id*. at K.12.

100.    In most circumstances, it is possible to accommodate religious beliefs "without imposing an undue hardship."  *Id*. at L.3.

**Defendant Cannot Establish Undue Hardship**

20

101.    Pursuant to ELCRA, the prohibition against religious discrimination imposes an affirmative duty on employers to reasonably accommodate the religious observances and practices of its employees, unless the employer can demonstrate that such an accommodation would cause undue hardship to the conduct of its business.  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977).

102.    "The obligation to provide religious accommodations absent undue hardship is a continuing obligation that allows for changing circumstances."  Guidance at L.6.

103.    Defendant bears the burden to show "that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship." *McDaniel v. Essex Intern., Inc.*, 571 F.2d 338, 341 (6th Cir.1978); *see also Baz v. Walters*, 782 F.2d 701, 706 (7th Cir.1986); *Redmond v. GAF Corp*., 574 F.2d 897, 901 (7th Cir.1978); *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1512 (9th Cir.1989).

104.    In the instant case, Defendant cannot show undue hardship.  An employer does not satisfy its burden "merely by showing that an accommodation would be bothersome to administer." *Draper v. United States Pipe & Foundry Co*., 527 F.2d 515, 520 (6th Cir.1975).

105.    Defendant told all Plaintiffs, "[y]our reassignment to another position was determined to not be a reasonable accommodation absent undue hardship" and "[r]eassignment of essential functions to other employees would also result in excessive cost to CRSC."  Defendant failed to divulge the expenses it would purportedly endure.  Critically, however, "[a] claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships; instead, it must be supported by proof of actual imposition on co-workers or disruption of the work routine." *Townley Eng'g & Mfg. Co*., 859 F.2d at 615 (9th Cir. 1988).

106.    "An employer cannot rely on speculative or hypothetical hardship when faced with an employee's religious objection but, rather, should rely on objective information."   EEOC Guidance at L.3.

107.    Here, Defendant accommodates other employees who submitted religious and/or medical accommodation exemptions and did not endure undue hardship.

108.    Defendant cannot claim undue hardship when other employees in similarly situated positions were granted religious accommodations.

**Defendant's Violations of the Fair Labor Standards Act**

109.    At all relevant times hereto, Defendant is an "employer" within the meaning of 29 U.S.C. § 203(d).

110.    At all relevant times hereto, Defendant was an "enterprise" within the meaning of 29 U.S.C. § 203(r).

111.    At all relevant times hereto, Defendant was an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of 29 U.S.C. § 203(s)(1).

112.    Defendant paid Plaintiffs and all other similarly situated individuals during their tenure an hourly wage with overtime premiums for some of the hours they worked in excess of forty (40) per week.

113.    Plaintiffs regularly worked more than 40 hours per week as non-exempt, overtime-eligible employees.

114.    Plaintiffs and all other similarly situated individuals performed tasks for Defendant's benefit.

115.    Plaintiffs and all other similarly situated individuals are paid on an hourly basis.

116.    Plaintiffs and all other similarly situated individuals earned quarterly bonuses based on established criteria.

117.    Defendant's quarterly bonus policy is titled the "Performance Incentive Bonus."

118.    The Performance Incentive Bonus states: "[Defendant] values the contribution of each employee.  [Defendant] designed a quarterly incentive bonus program to reward eligible staff for their contribution towards helping [Defendant] meet specified criteria."

119.    The Performance Incentive Bonus "Procedure" is written as follows:

*Effective July 1, 2014, the performance incentive bonus is distributed following each quarterly award period if specified criteria are met.*

*Award periods are:*

- *January – March*
- *April – June*
- *July – September*
- *October – December*

*Eligible employees must meet the following criteria:*

- *Must accumulate hours worked during the award period; Only Regular, Training, Overtime, and Low Census hours are included in the bonus formula.*
- *May not be within the 90-day probation period.*
- *May not have had a disciplinary action within the award period, to include a written warning, performance improvement plan (PIP), or suspension.*
- *Must be actively employed through the last day of the award period.*
- *Must be permanent employees (not temporary or contract workers)*

*Each individual's bonus calculation includes hours worked for each month within the award period.*

120.    The Performance Incentive Bonus is non-discretionary, *i.e.*, if Plaintiffs and all other similarly situated individuals satisfied the stated criteria, he or she received the quarterly bonus.

121.    Defendant did not include quarterly bonuses in total compensation for Plaintiffs, or all other similarly situated individuals, resulting in a reduced regular rate of pay and reduced overtime pay to Plaintiffs, and all other similarly situated individuals.

122.    Upon information and belief, Defendant knew, or showed reckless disregard, for whether its pay practices towards Plaintiffs and other non-exempt, overtime-eligible employees violated the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

123.    Plaintiffs seek to represent the following FLSA collective classes:

a.      A class of Defendant's employees who received non-discretionary bonuses where the bonuses were not included in total compensation for determining the regular rate of pay and overtime compensation ("Bonus Collective Class").

124.    The class definition for the Bonus Collective Class is:

Current and former employees of Defendant during the period of the last three years who were non-exempt, overtime eligible, who did not sign an arbitration or class action waiver provision in order to be employed by Defendant, and who received non-discretionary bonuses and such bonuses were not included in the employee's total compensation for determining the regular rate of pay and corresponding overtime compensation.

125.    The putative collection action members are similarly situated because, based on Defendant's established policies, procedures, and practices, all putative Bonus Collective Class members did not receive full overtime compensation as required by the FLSA when non-discretionary bonuses were not included in total compensation for determining the putative class members' regular rate of pay and corresponding overtime rate.

**COUNT I**
**Violation of Elliott-Larsen Civil Rights Act ("ELCRA")**
**Religious Discrimination—Failure to Accommodate**
**(On behalf of Plaintiffs)**

126.    Plaintiffs restate the foregoing paragraphs as set forth fully herein.

127.    At all relevant times hereto, Plaintiffs were employees and Defendant was their employer for the purposes of ELCRA

128.    ELCRA makes it unlawful for an employer to fail or refuse to reasonably accommodate the religious beliefs and practices of an employee or prospective employee.

129.    ELCRA prohibits an employer from discriminating against an employee because of religion.

130.    After receiving an accommodation request, "the employer is obligated by law to engage in interactive process – a meaningful dialogue with the employee[.]" *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (5th Cir. 2009).

131.    The employer must act in "good faith," *Id.*, and the employee must "make a good faith attempt to satisfy his needs through means offered by the employer," *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982)

132.    ELCRA makes it unlawful for an employer to retaliate against an employee who engaged in protected activity.

133.    Plaintiffs hold sincere *bona fide* religious beliefs that preclude them from receiving a COVID-19 vaccine.

134.    Plaintiffs informed Defendant of those beliefs and requested religious accommodation from the vaccine mandate.

135.    Defendant refused to engage in a meaningful interactive process with Plaintiffs regarding their religious accommodation requests.

136.    Under ELCRA, Plaintiffs can establish a *prima facie* case of religious discrimination based on a failure to accommodate by showing: (1) they have a *bona fide* religious belief that conflicts with an employment requirement; (2) about which they informed the [Defendant]; and (3) they suffered an adverse employment action for failing to comply with the conflicting employment requirement.  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986).

137.    Multiple accommodations could have been offered to Plaintiffs.  They include mask wearing and periodic testing for COVID-19—the very same accommodations being offered to virtually every public and private employee in the State of Michigan.

138.    A "[r]easonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995).

139.    Defendant would not suffer undue hardship by granting Plaintiffs an accommodation.

140.    The issue became moot when Defendant failed to engage each employee in "a meaningful dialogue" about the accommodation request and learn whether an acceptable accommodation would impose undue hardship.  *Chevron Phillips Chem. Co.*, 570 F.3d at 621 (5th Cir. 2009).

141.    Instead, Defendant announced a one-size-fits all approach to accommodation that deprived Plaintiffs of the conversation necessary to discover what accommodations were possible. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) ("courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary" and "[a] party that fails to communicate... may also be acting in bad faith").

142. Irrespective of the interactive process, Defendant failed to provide Plaintiffs with reasonable accommodations for their religious beliefs.

143. Defendant thereby discriminated against Plaintiffs because of their religious beliefs.

144. Defendant's failure to provide religious accommodations has harmed and will continue to harm Plaintiffs.

145. As a direct and proximate result of Defendant's violation of ELCRA, Plaintiffs have suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

146. As a further direct and proximate result of Defendant's violation of ELCRA, Plaintiffs have been denied employment and placed in financial distress and have suffered a loss of earnings and benefits, and a loss of and impairment of their earning capacity and ability to work and will so suffer in the future; they have been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

147. By failing to engage in the interactive process or offer any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless and in violation of ELCRA.

## COUNT II
### Violation of Elliott-Larsen Civil Rights Act ("ELCRA")
### <u>Religious Discrimination—Retaliation</u>
### (On behalf of Plaintiffs)

148. Plaintiffs restate the foregoing paragraphs as set forth fully herein.

149. At all relevant times hereto, Plaintiffs were employees and Defendant was their employer.

150.    ELCRA prohibits an employer from discriminating against an employee because of religion.  This "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."

151.    Pursuant to ELCRA, it is unlawful for an employer: (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's... religion; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individuals... religion[.]"

152.    Defendant's mandatory vaccination policy evades any sort of bilateral cooperation or interactive process.

153.    Simply by failing to engage with Plaintiffs as to the possible reasonable accommodations, Defendant has violated the law.

154.    Plaintiffs engaged in protected activity when they requested religious accommodations from Defendant's vaccine mandate.

155.    Defendant retaliated against Plaintiffs by placing them on involuntary unpaid leave, with benefits soon being stripped away, and then formally terminating them on February 3, 2021.

156.    This occurred even though Defendant granted other the accommodation requests of other employees.

157.    Plaintiffs' religious beliefs and protected activity were the causes of Defendant's adverse employment action.

158.    By retaliating against Plaintiffs for engaging in protected activity, Defendant has violated ELCRA.

159.    This violation has harmed and continues to harm Plaintiffs.

**COUNT III**
**Violation of the FLSA, 29 U.S.C. § 203, *et seq*.**
**Failure to Pay Overtime on Non-Discretionary Bonuses**
**(On behalf of Plaintiffs and the Bonus Collective Class)**

160.    Plaintiffs, and all others similarly situated, restate the foregoing paragraphs as set forth fully herein.

161.    During the three-year period preceding the commencement of this action, Defendant paid to its non-exempt employees periodic non-discretionary bonuses.

162.    For one or more of these non-discretionary bonuses, Defendant failed to include a prorated amount of the non-discretionary bonus in Plaintiffs and the putative Bonus Collective Class members' total compensation for purposes of determining such employees' regular rate of pay and proper overtime payment.

163.    Defendant's conduct was willful.

164.    Plaintiffs and putative Bonus Collective Class members have suffered harm as a result of Defendant's willful violation of the FLSA and are entitled to recover unpaid overtime, interest on unpaid overtime, liquidated damages, costs, and attorneys' fees as allowed by law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter the following relief:

(A)    Declare that Defendant has violated ELCRA by failing to engage in the interactive process in response to requests for accommodation to its COVID-19 vaccine mandate;

29

(B)    Declare that Defendant has violated ELCRA by discriminating against Plaintiffs by failing to provide reasonable accommodations to its COVID-19 vaccine mandate;

(C)    Declare that Defendant has violated ELCRA by retaliating against Plaintiffs for engaging in protected activity;

(D)    Conditionally certify the FLSA Bonus Collective Class and authorize that notice be sent to class members, informing them of their rights to consent to join the FLSA portion of this action and designation of this action as a collective action pursuant to 29 U.S.C. § 216(b);

(E)    Declare that Defendant violated the FLSA by not properly paying wages and overtime to Plaintiffs and the Bonus Collective Class members for the activities described in the above paragraphs;

(F)    Declare that Defendant's violations of the FLSA were willful;

(G)    Award Plaintiffs and the Bonus Collective Class damages, including back pay, reinstatement or front pay, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

(H)    Award Plaintiffs and the Bonus Collective Class reasonable attorneys' fees and costs.

(I)    Grant any other relief that the Court deems just, proper, and equitable.

Respectfully submitted,

HURWITZ LAW PLLC

/s/ *Noah S. Hurwitz*
Noah Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
*Attorneys for Plaintiff*
617 Detroit St., Ste. 125

Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com
Kara@hurwitzlaw.com

Dated: May 20, 2022

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

MELINDA CHALLENDER, JESSICA GREENE,
BRITTANY KRITZ, DARNELL MUDGETT,
MIKAELA SCHAEFER, and ASHLEY TRYLCH,
On their own behalf and on behalf of
all others similarly situated                                      Case No.

         Plaintiffs,                                                      Hon.

v.

NORTHWEST MICHIGAN SURGERY CENTER,
L.L.C. d/b/a COPPER RIDGE SURGERY CENTER,

         Defendant.

---

Noah S. Hurwitz (P74063)
Grant M. Vlahopoulos (P85633)
Kara F. Krause (P85487)
HURWITZ LAW PLLC
*Attorneys for Plaintiff*
617 Detroit St. Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
noah@hurwitzlaw.com
grant@hurwitzlaw.com
kara@hurwitzlaw.com

---

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs Melinda Challender, Jessica Greene, Brittany Kritz, Darnell Mudgett, Mikaela

Schaefer, and Ashley Trylch, on behalf of themselves and similarly situated individuals, by and

through their attorneys, Hurwitz Law PLLC, hereby demand a trial by jury in the above-captioned

matter for all issues triable.

                           Respectfully Submitted,
                           HURWITZ LAW PLLC

                           */s/ Noah S. Hurwitz*
                           Noah S. Hurwitz (P74063)
                           Grant M. Vlahopoulos (P85633)

Kara F. Krause (P85487)
*Attorneys for Plaintiff*
617 Detroit St., Ste. 125
Ann Arbor, MI 48104
(844) 487-9489
Noah@hurwitzlaw.com
Grant@hurwitzlaw.com
Kara@hurwitzlaw.com

Dated: May 20, 2022